(C. D. 342)

F. W. MYERS & CO., INC. *v.* UNITED STATES

## United States Customs Court, Third Division

(Decided May 24, 1940)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Francis X. O'Donnell* and *Joseph F. Donohue*, special attorneys), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is an action wherein the plaintiff seeks to recover certain sums of money claimed to have been unlawfully collected as customs duties on an importation of frozen beef livers that entered this country at the port of Rouses Point, N. Y., from the Dominion of Canada. The collector assessed duty at 6 cents a pound under the provisions of paragraph 706 of the Tariff Act of 1930 which provides for "Meats * * * frozen * * * not specially provided for." The importer, the plaintiff herein, claims that the merchandise is dutiable under the provision of the tariff act that relates to crude drugs of vegetable or animal origin (1669). He makes an alternative claim for assessment at 10 per centum ad valorem under paragraph 34 of the same act which provides for drugs, advanced. Apparently he does not rely upon this claim and the protest so far as it relates to such claim is overruled.

The provisions of the statute involved are as follows:

PAR. 706. Meats, fresh, chilled, frozen, prepared, or preserved, not specially provided for, 6 cents per pound, but not less than 20 per centum ad valorem.

FREE LIST

PAR. 1669. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

The testimony discloses that the beef livers in question originated in the abattoir of Canada Packers, Ltd., in Montreal, Canada. The merchandise was invoiced as "Frz. Beef Livers," under which description was the notation "Beef livers for medicinal purposes only." The consumption entry bears a notation that the commodity was

frozen beef livers, inedible and unfit for human consumption (for medicinal purposes only). Attached to the official papers is a meat inspector's certificate issued by the Department of Agriculture for the Dominion of Canada dated May 23, 1938, on their printed form, which is as follows:

DOMINION OF CANADA—NO. 9751

DEPARTMENT OF AGRICULTURE—HEALTH OF ANIMALS BRANCH
MEAT AND CANNED FOODS DIVISION

\* \* \* \* \*

ORIGIN AND MANUFACTURE SOLELY CANADIAN

7d

Place Montreal, Canada                                    Date May 23, 1938

This is to certify that the meat or meat food products herein described were derived from animals which received ante-mortem and post-mortem veterinary inspection at the time of slaughter, and that said meat and meat food products are sound, healthful, wholesome and otherwise fit for human food, and have not been treated with and do not contain any preservative, colouring matter, or other substance not permitted by the Meat and Canned Foods Act and Regulations, and have been handled only in a sanitary manner in this country.

| Kind of product | Number of pieces or packages | Weight |
|---|---|---|
| Fresh Frozen select calf livers | 67 crts | 4020 lbs. |

Identification marks on meats and packages   Foreign Export Stamps:–131801–867
Consignor   CANADA PACKERS LIMITED   Address   Montreal, Canada
Consignee   Bronx Refrigerating Co., Destination   New York, N. Y.
Shipping marks   CN 207029   via Rouses Point, N. Y.

G. T. LABELLE
*Inspector under Meat and Canned Foods Act*

This inspection report covers 67 cases weighing 4,020 pounds of fresh frozen select calves livers. With the papers we find an inspection of import meat and products report dated May 31, 1938, at New York, covering 67 crts. Fr. Froz. Calf Livers weighing 4,020 pounds, with the notation that "Frozen beef livers not inspected by this Department; importer permitted to take access of same." Another inspection report signed by the same G. T. Labelle of the Department of Agriculture, Montreal, Canada, dated May 23, 1938, covers 65 barrels and 66 boxes the contents described as "Frozen Beef Livers— For medicinal purposes only." This certificate carries the following printed statement thereon:

I, G. T. Labelle hereby certify that the following described shipment consists of carcasses, portions or products which are inedible and unfit for food; that this

was obtained from animals that were free from Contagious Disease as dealt with under The Animal Contagious Diseases Act, and that the containers in which such carcasses or products are being transported are marked in accordance with the requirements of the regulations.

The instant protest relates solely to the frozen beef livers. The collector stated in a notation with the official papers, as his reason for assessing duty thereon, that there was insufficient evidence given by the importers to show that the livers were not edible.

The testimony was given in reverse order, that is to say, the importer called a representative of the Lederle Laboratories, Inc., for whose account the merchandise in question was imported. Mr. David I. Stadden testified that for 7 years he was production chemist in charge of manufacturing liver products. He stated that this concern, among other things, manufactures liver products used in the treatment of pernicious anemia and products containing vitamins, some of which are obtained from liver; that the Lederle Laboratories are engaged in supplying serums and pharmaceuticals for the medical profession. He swore that his concern received the beef livers in question from the Bronx Refrigerating Co. where they were stored until they could be withdrawn for manufacturing purposes. He testified that he was familiar with what was done with the importation, having kept a record of the same. He then described the products into which these livers were made. He testified that the livers were made into three distinct types of liver extract, each of which was used in the treatment of pernicious anemia; that some were made into a Vitamin B preparation called Vitamin B complex oral, and some into a Vitamin B complex solution or extract, both of the latter used in the treatment of a vitamin deficiency. He described the processes of making the various products from the livers, the details of which, in our judgment, are not important to a decision in this case. Samples of these products were introduced in evidence and marked Illustrative Exhibits A, B, C, D, and E.

At a later session of court the importer called as a witness Dr. Joseph Kaufmann, a physician of 30 years' experience, a graduate of McGill University and a fellow of the American College of Physicians and of the Royal College of Physicians, attending physician at the Royal Victoria Hospital, and consulting physician to two other hospitals. This witness was also on the professional staff at McGill University, teaching internal medicine and particularly diseases of the blood, including anemia. He stated that he had been on the staff of the University for 28 years; that most of his work has been in haematological diseases; that at the Royal Victoria Hospital he is attending physician, at certain times of the year in charge of the wards; is in charge of the laboratory of haematology; that he does a great deal of the laboratory work personally and treats many patients

for anemia. He stated that at the date he gave his testimony he had treated or supervised the treatment of 7,203 patients who were examined or treated for haematological ailments.

He said that in his experience he had made use of liver and liver extracts for the treatment of diseases; that he had used these articles extensively; that he had prescribed and administered products like Illustrative Exhibits A to E; and that these products have therapeutic values, which he described. He stated that Exhibits A and B, 1 cc liver extract and 3 cc liver extract, respectively, are administered intramuscularly, by injection with a syringe; that each is used for treatment of pernicious anemia and conditions which often accompany that disease, such as sub-acute compound sclerosis of the spinal cord, or complications which may precede the disease. The difference between these two solutions or extracts is that the 1 cc is more potent and therefore can be used in smaller quantities than the 3 cc. The witness stated that the oral liver extract, Exhibit C, is administered by the mouth. The witness then gave the following testimony:

Some people object to having needles stuck into their skin or muscles repeatedly. Some people like it better that way. Some people are not accessible to physicians or hospitals and if they go away for holidays where such treatment is impossible by needle it is quite nice to take the treatment out of the bottle and it works fairly efficiently. It has objections, of course. You have to take larger doses, more frequently, and it is more expensive.

With reference to Vitamin B complex oral, Exhibit D, he gave the following testimony:

The nervous complications that go with these anemias have to get a vitamin which is anti-neuritic, which prevents the disease affecting the nervous system. Many of these people get a decided improvement in their blood but unless the treatment is combined, in many instances, they may die from the neuritic complications, so Vitamin B Complex Oral is an integral part of the treatment. The treatments are combined.

He also stated that the same is true of Vitamin B complex parenteral, Exhibit E. When asked what therapeutic purposes were served by the use of Exhibits A to E, Dr. Kaufmann gave a technical explanation which may be summed up by saying that these liver extracts are used for supplying a maturation factor in the blood. He stated the whole question is one of supplying a maturation factor; that there are "other factors of a more technical nature which come in in the treatment and which are related in a general way to the formation of this anti-anemic factor."

He then was asked the following question and gave the answer thereto as follows:

Q. Has it been your experience and observation that liver extract has been beneficial in the treatment of the diseases which you have named?—A. It has been one of the most phenomenal therapeutic agents of the last seven or eight years, equalling only insulin and several other drugs used for treating fatal diseases.

Q. I take it the answer is "Yes"?—A. Yes.

On cross-examination he was asked:

X Q. I see what you mean, Doctor. I wonder if you can answer this way. Would you say that any agent which has specific curative properties for a specific disease has therapeutic value?—A. Certainly.

X Q. And then would you say that such an agent would have therapeutic value whether it is a food or a drug?—A. Well, absolutely.

And farther on:

X Q. Is it not a fact that the ordinary beef liver contains therapeutic value?— A. Yes.

Mr. Donald J. Perry, called by the plaintiff, testified that he is connected with the Canada Packers, Ltd., where he has been employed for 17 years. He described the nature and character of his work and stated that he was familiar with the preparation of most of the company's products, having personally observed the process, and that he was familiar with the manner in which frozen livers are prepared; that he has seen the preparation "probably hundreds of times"; that he is in charge of shipments of these products and that he supervises the preparation of the necessary shipping documents therefor. He identified the consular invoice covering 65 barrels and 66 boxes of frozen beef livers as one that he had signed. He stated that these livers were sold and shipped to the Lederle Laboratories. Over objection he was permitted to testify that these livers were sold and shipped as inedible livers. He was asked if there was any difference in the preparation of those to be consumed as food and those put out as inedible. He stated that "the difference lies in the inspection. They are not inspected for export and there was no meat certificate issued for them or sticker put on them." He said they were hard frozen, that each liver was frozen individually at Lederle's request. We quote from the testimony as follows:

Q. Will you please describe what is done to frozen beef livers from the time the liver is taken from the animal until the time it is shipped?—A. First they are washed down and chilled. The hot liver cannot be placed in a sharp freezer at a low temperature. The animal heat is first withdrawn in a cooler and they are placed in a sharp freezer and hard frozen for preservation.

Q. Is anything done to them beyond the freezing?—A. That is the only preparation.

Q. What is the purpose of the freezing?—A. To preserve them.

Q. Would it be possible to ship them otherwise?—A. No. Not for any distance.

Q. Now, Mr. Perry, is there any difference between the manner—I am relating to the necessary documents—the manner in which edible beef livers are shipped and the manner in which inedible beef livers are shipped?

Judge Evans. Yes or no, please.

A. Yes.

Q. Please state the difference.

Mr. Donohue. I object to the question as immaterial and irrelevant.

Mr. Schwartz. I think it pertinent. They have to obtain certain certificates in case of edible.

Mr. Donohue. Certain certificates are required if the merchandise is to be shipped and used as food. I submit it is not relevant and misleading on the question of whether they are edible beef livers. The livers dutiable at the rate provided by statute were undoubtedly edible and Congress undoubtedly intended to provide for beef liver when the rate of duty was defined. I notice in the collector's letter of transmittal there is a statement "in as much as sufficient evidence was not given by the importers to show that the livers were not edible, they were assessed for duty at .06¢ per lb. under Par. 706". That may be one point to be considered in passing on the materiality.

Judge Evans. I believe it competent. I overrule the objection and allow an exception.

Q. Will you please state the difference between the manner in which edible livers are shipped and inedible livers are shipped?—A. When the livers are shipped for food they must be shipped under pure food inspection. Meats cannot be sold and shipped for export to a foreign country unless shipped under inspection. The Bureau of Animal Industry in the United States will not allow you to enter for food purposes unless——

\* \* \* \* \* \* \*

Q. Please confine your answer to the shipping in Canada.—A. When shipped for food, a pure food sticker has been applied to the package and a certificate issued covering the number of that sticker, signed by an inspector of the Department of Agriculture, signifying the meat was properly prepared under sanitary conditions.

Judge Evans. Department of Agriculture of the United States?

The Witness. Of Canada.

By Mr. Schwartz.

Q. And are those things required to be done in the case of beef liver exported for inedible purposes?—A. No. The cases are marked the same as are other pharmaceutical products and were marked for medicinal purposes only and no pure food certificate issued.

Q. You say that was not done in the case of the frozen beef livers covered by this case?—A. No.

Mr. Schwartz. Your witness.

On cross-examination he stated that the imported livers were the same as the item of healthy animal beef liver used for food purposes, and are frozen in the same manner. When asked the following question:

The only difference in shipping the livers in this case and ordinary beef livers is that you did not apply the pure food stickers?

He answered:

A. But they cannot be merchandised for food.

The importer relies on a line of cases which passed upon the dutiable status of pituitary and other glands of animals, imported into the United States for the purpose of making medicinal preparations. In none of these cases, however, did it appear that the glands in question were edible in the ordinary meaning of that term. That is, in no record was it shown that such glands were ever used as food. In the case of *Frankfeld & Co.* v. *United States*, 7 Ct. Cust. Appls. 296,

T. D. 36805, cited, it was sought to establish, among other things, that the glands there involved were dutiable under the drug paragraph but the court held against such contention because the commodities involved were not "such as" those enumerated.

The crude drug paragraph of the Tariff Act of 1922, paragraph 1567, contained this phrase "and all other drugs of vegetable or animal origin." The court held in the case of *Vandegrift & Co.* v. *United States*, 13 Ct. Cust. Appls. 30, T. D. 40865, that certain inedible portions of cattle, such as glands, imported dried and ground, for the purpose of extracting medicine therefrom should be admitted free under the provisions of said paragraph. To the same effect is the case of *Parke, Davis & Co.* v. *United States*, T. D. 40475, 46 Treas. Dec. 353, that certain pituitary and other glands of animal origin, some of which were fresh and others desiccated, were drugs and free of duty under said paragraph 1567 of the Tariff Act of 1922.

If the instant merchandise is to be classified as "all other drugs of vegetable or animal origin," it must appear first that the commodity is a drug. In the first instance livers have been held to be meats. *United States* v. *Swift & Co.*, 13 Ct. Cust. Appls. 542, T. D. 41428. In that respect the present importation originates on a different state of facts. The commodities cited above relating to glands and other inedible portions of cattle were never foods, and the testimony did not show them to be foods in the first instance. Under paragraph 34 of the Tariff Act of 1930, it is provided:

* * * That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and *chiefly used for medicinal purposes.* [Italics not quoted.]

The record before us undoubtedly shows that beef liver has therapeutic or medicinal properties and that the chief and only use of this particular importation is for medicinal purposes. Paragraph 1669, *supra*, the crude drug paragraph, provides for certain crude drugs therein described which are "not edible." So far as this record shows the only reason offered in support of the plaintiff's theory of non-edibility of the imported beef livers is that the packer did not request the placing of the inspection label on the merchandise and the accompanying certificates on the packages. It was admitted, as stated above, that the imported livers were the same as the item of healthy animal beef liver used for food purposes, and are frozen in the same manner. It therefore appears to the court that they fall within the common meaning of the word "edible." In the case of *United States* v. *Yick Shew Tong Co.*, 25 C. C. P. A. (Customs) 255, T. D. 49392, the court held that:

* * * The word edible, we think, must be given its common meaning and construed in the sense of its ordinary use and acceptance. Webster's New International Dictionary gives the adjective meaning of the word as "Fit to be eaten *as food*; eatable; esculent; as, *edible* fishes." [First Italics ours.]

The definitions by other authorities are of the same purport. That given by the Century Dictionary and Encyclopedia reads:

*Edible*—1. a. Eatable; fit to be eaten as food; esculent; specifically applied to objects which are *habitually* eaten by man, or *specifically* fit to be eaten, among similar things not fit for eating; as edible birds' nests; edible crabs; edible sea-urchins. * * * [Italics new here.]

So far as the record shows these beef livers are "fit to be eaten as food" as imported and such beef livers are habitually so eaten. The intimation that, due to certain statutory restrictions imposed by Canada on food products for export, they would not be merchantable as food, does not, in our view, affect the edibility of the product but rather the salability. They have not been rendered unfit to be eaten as food by any process either natural or as the result of manufacturing.

We therefore overrule plaintiff's contention and hold that the collector's assessment was correct. Judgment for defendant. It is so ordered.